# STATE OF LOUISIANA

## COURT OF APPEAL, THIRD CIRCUIT

## 04-1550

**JOSEPH S. PROVOST, JR. AND JOANNA D. PROVOST**

**VERSUS**

**USA TRUCK, INC., ET AL.**

***************

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF LAFAYETTE, DOCKET NO. 20023116
HONORABLE GLENNON P. EVERETT, DISTRICT JUDGE

**************

**SYLVIA R. COOKS**
**JUDGE**
**************

Court composed of Sylvia R. Cooks, Marc T. Amy, and Glenn B. Gremillion, Judges.

**AFFIRMED IN PART;**
**REVERSED IN PART; AND RENDERED.**

Barry J. Heinen
A Professional Law Corporation
1502 West University Avenue
Lafayette, Louisiana 70506-3342
(337) 237-3550
COUNSEL FOR APPELLEES AND CROSS-APPELLANTS:
    Joseph S. Provost, Jr. and Joanna D. Provost

John P. Guillory
James M. Dill
The Dill Firm
825 Lafayette Street
Post Office Box 3324
Lafayette, Louisiana 70502-3324
(337) 261-1408
COUNSEL FOR APPELLANTS:
    USA Truck, Inc. and David Voss

**COOKS, Judge.**

**STATEMENT OF THE CASE**

This case arises from a vehicular fatality which claimed the life of twenty-year old Jason Horace Provost, son of John and Joanna Provost. The Provosts filed a wrongful death claim against USA Truck, Inc. (USA Truck), owner of the 18-wheeler involved in the accident, and David Voss, its driver. Trial on the merits was held on January 5, 2004. The jury rendered a verdict awarding the sum of $75,000.00 each to John and Joanna for the death of their child. The jury assessed fault to USA Truck and David Voss in the amount of 25% and against Jason in the amount of 75%. After trial, the Provosts filed a Motion for Judgment Notwithstanding the Verdict. On April 12, 2004, the trial court granted the Provosts' motion and increased the award of damages to each parent to $250,000.00. The trial court issued a judgment casting the Defendants with all court costs.

USA Truck and David Voss filed this appeal asserting several assignments of error. The Defendants contend the jury erred in finding them 25% at fault in causing the accident. Additionally, USA Truck and David Voss contend the trial court erred in granting a Judgment Notwithstanding the Verdict (JNOV) and awarding damages in the amount of $250,000.00 to each of Jason's parents. The Provosts filed a cross-appeal arguing the jury erred in assessing Jason with 75% fault and USA Truck and David Voss with only 25% fault.

For the reasons assigned below, we affirm the decision of the trial court awarding Joseph and Joanna Provost $250,000.00 each for the death of their son. However, because we find overwhelming evidence in the record of gross negligence on the part of USA Truck and David Voss, we reverse the judgment of the trial court and find USA Truck and David Voss 75% at fault and Jason 25% at fault in causing

2

this vehicular fatality.

## STATEMENT OF THE FACTS

On July 1, 2001, at approximately 3:45 a.m., Jason was driving his 1993 Chevrolet pickup truck, easterly on Interstate 10, on his way home to Breaux Bridge. He had just left Lafayette where he dropped his best friend, John Sassou, off at his home. John testified Jason and he were together during the evening and when Jason left to travel home he was alert and unimpaired. In fact, the toxicology report indicated Jason was not intoxicated at the time of the accident. July 1, 2001 was a moonless night, "dark as hell", and the stretch of interstate where the accident occurred was not illuminated and was deserted. When Jason approached interstate mile marker 107, he inexplicably drifted off the roadway, traveled approximately 155 feet on the shoulder and slammed into the back of a disabled USA Truck 18-wheeler which had been parked on the shoulder for several hours prior to the crash. Jason was killed instantly. John Provost described the horror of receiving news of his child's death from State Troopers in the early morning hours of July 1, 2001:

> *I guess it was about 6:45 in the morning. There was a knock on the door. My wife got up. She thought it was him. She opened the door. I stayed in the bed. And I heard her scream. I got up and I looked in the hallway. I saw, you know, the State Police. I knew something was wrong. So they - they told me that Jason had been in an accident and got killed.*

State Trooper Eric Burson arrived on the scene at approximately 4:06 a.m., along with members of the sheriff's department, state police and fire department, to inspect the accident site and determine the cause of the fatality. When Trooper Burson arrived on the scene he saw Jason's truck wedged underneath the 18-wheeler. His body had to be extricated using some sort of mechanical device. Trooper Burson noted that particular stretch of interstate did not have rumble strips to warn a drifting driver. Rumble strips have since been installed.

Trooper Burson inspected the 18-wheeler and found reflector strips on the side and rear of the trailer. He interviewed the driver of the 18-wheeler, David Voss, and determined Mr. Voss had left the T/A Center in Lafayette at approximately 12:30 a.m. and was on his way to the Pilot Station in Breaux Bridge when his truck broke down. Mr. Voss testified he had been having a history of mechanical problems with his truck and his air conditioning system had not been working for several days. He testified the truck broke down the day before in Baton Rouge and he had to get out of the cab and direct traffic around the truck. He notified the company and the truck was towed to a food store parking lot. USA Truck sent two men to inspect the truck. The truck was started and Mr. Voss drove to Lafayette. It was summer in Louisiana and Mr. Voss decided to stop at the T/A Center to get his air conditioning repaired. The T/A Center mechanic was unable to fix his air conditioning because the truck needed a part. He began to look for a place to park and sleep at the T/A Center, but could not find one. He decided to get back on the road and travel to the Pilot Station to find a place to sleep for the night. When he reached interstate mile marker 107 the electrical system in the truck failed. Mr. Voss stated: "I lost my lights, and my power started diminishing until I had no power left at all; and I downshifted and tried to kick the engine to keep it going and using my clutch, but I couldn't keep it rolling. I had no power at all." The Trooper determined Mr. Voss had been broken down on the side of the dark, deserted interstate shoulder for several hours with no means of communication. His truck had no electrical power, no lights, no emergency flashers, no CB radio, and no cell phone. Mr. Voss testified: "My cell phone I – I was over my – I didn't send the last bill, so they cut me off; so I couldn't use that, and I had no power on my cell phone to make contact." The only means of communication on the truck was a Qual-Com system which was non-operational because it worked on the electrical system. The truck had

4

no refrigerator or t.v. which could have drained power from the battery thereby disabling the truck. Although he was only a short distance from his destination, the Pilot Station, Mr. Voss did not check his map and chose to retreat to the safety of the cab rather than seek assistance to move his disabled truck off of the shoulder. He apparently concluded it was safer for him to remain in the cab of his 18 wheeler truck than to walk on the shoulder of the highway where a vehicle may, in a moment of inadvertence, drift from the roadway onto the shoulder and hit him. He testified: "People were doing 70 and 80 miles an hour on that road, and I wasn't about to get hit." The only safety measure he took was to place a triangle on the shoulder approximately 275 feet behind the truck and another one approximately 155 feet behind the truck. After placing the triangles on the shoulder, Mr. Voss climbed into his cab and went to sleep.

Mr. Voss admitted he was an inexperienced cross-country driver. He had only been employed by USA Truck since February 2001 and had had two other accidents prior to this one. On April 17, 2001, two months after he was licensed, he drove into a ditch and on May 25, 2001, he hit several parked cars. Mr. Voss was fifty years old and on high blood pressure medication, although this medication, according to the testimony, would not disqualify him as a cross-country driver. He is no longer employed as a truck driver and is currently employed by Sam's Club and Exxon as a convenience store cashier. His actions after the accident aptly demonstrate his inexperience. He testified after the crash, he "freaked out." He saw Jason in the truck and could tell he was seriously injured or dead. He testified he tried to flag down help "until I felt my safety was in jeopardy, and I went to the confine of my cab . . . I figured I would wait it out until morning."

Jim Shaffer, maintenance supervisor for USA Truck, testified there were no

procedures in place for a driver to follow in case of an emergency stop and the company provided no training sessions on emergency procedures for its drivers. He stated the drivers should just rely on their "common sense." Faced with an emergency situation, Mr. Shaffer opined a driver "either waits for a police officer to come by, or flags another trucker down, or gets a ride, or walks to the next exit, so he can make a phone call in."

Not only was Mr. Voss an inexperienced cross-country driver, the truck USA Truck gave him to drive had a history of electrical failure. Between March 10, 2001 and July 1, 2001, the truck broke down eleven times all over the United States and Canada. The following is the history of the breakdowns:

| DATE | LOCATION | COMPLAINT | CAUSE |
|---|---|---|---|
| 3/10/01 | Lakefield, Ontario | Truck will not start | Low batteries |
| 3/10/01 | Pickering, Ontario | Alternator not charging | Loose ground, battery dead |
| 3/12/01 | Detroit, Michigan | Truck will not start | Low batteries |
| 3/20/01 | Westlake, Ohio | Check charging system | Positive post on starter loose |
| 4/11/01 | Frederick, Maryland | Truck will not start | Batteries dead |
| 5/3/01 | Fayetteville, N.Carolina | Truck will not start | Low batteries |
| 5/15/01 | Bridport, Vermont | Truck will not start | Corroded battery connections |
| 5/25/01 | Brooklyn, New York | Truck will not start | Low batteries |
| 6/29/01 | Atlanta, Georgia | Truck will not start | Batteries dead |
| 6/30/01 | Baton Rouge, LA. | Truck will not start | Low batteries |

USA Truck knew or should have known of the problems with the truck. Mr. Voss testified: "[T]here is documentation made either on the computer or by hand; that each time a driver does a call in, there is a notation so they can refer back to it in case there is a problem." Mr. Shaffer testified regarding the protocol when a fleet vehicle breaks down: "A driver will call in with a problem with his tractor and trailer. He'll give us his location, and tell us what problem he's having, and we will send him someplace to get it repaired, or send road service to him or her." He stated a working

6

cell phone is not required equipment on company trucks. In this case, when Mr. Voss' truck would break down, USA Truck would send a representative to either jump start the battery or pull start the truck. The truck was never taken out of service to determine the source of the electrical failure. Despite a documented record of repeated incidents of engine failure, USA Truck kept the truck in service and kept an inexperienced driver behind the wheel driving across the country with no means of communication in case of engine failure, which given the truck's history, was virtually certain to occur. Finally, on July 24, 2001, just weeks after the fatal accident, USA Truck took the 18-wheeler out of service.

There is no dispute Jason momentarily drifted from the highway onto the shoulder. Trooper Burson opined Jason probably left the roadway somewhere near the 155 foot triangle because that triangle was crushed, apparently by his truck, when he traveled onto the shoulder. Trooper Burson testified: "[I]t appears that he gradually drifted . . . from where the first triangle was broken to where the impact was at, and it didn't appear to be anything abrupt." He found no evidence of braking or turning. Once Jason drifted off the roadway, and struck the triangle approximately 155 feet from the rear of the truck, it was too late to react or avoid the crash. Assuming he was traveling the interstate speed limit of 70 mph, it would have taken him only 1.4 seconds to travel the 155 feet before striking the rear of the trailer.

## LAW AND DISCUSSION

*Liability and Apportionment of Fault*

USA Truck and Mr. Voss contend the jury erred in finding them 25% at fault. The Defendants contend Jason was solely at fault in momentarily drifting onto the shoulder. In order to determine the liability of USA Truck, using a duty-risk analysis, we must examine whether the conduct in question was the cause-in-fact of the resulting harm,

7

whether the defendant owed a duty to the plaintiff which defendant breached and whether the risk of harm was within the scope of protection afforded by that duty. *See Campbell v. La. Dep't. of Transp. & Dev.*, 94-1052 (La. 1/17/95), 648 So.2d 898. Applying this test to the facts of the present case, we agree with the jury's finding of liability on the part of USA Truck and Mr. Voss.

USA Truck had a duty to maintain its vehicles in proper working order. Federal Motor Carrier Safety Regulation, Section 396.7(a) provides as follows:

> A motor vehicle shall not be operated in such a condition as to likely cause an accident or a breakdown of the vehicle.

USA Truck contends this statute cannot be used to impose liability for failure to maintain its vehicle. USA Truck relies on *Sumner v. Sumner*, 95-677 (La.App. 3 Cir. 11/8/95), 664 So.2d 718, *writ denied*, 95-2919 (La. 2/9/96), 667 So.2d 531. In *Sumner*, this court found the particular statute relied on by plaintiff inapplicable because the trucker in question stopped for approximately two minutes on the shoulder of the interstate to fix a broken windshield wiper and did not leave his vehicle unattended. However, the vehicle in question had numerous breakdowns, and at the time of the accident, was broken down on the shoulder of the interstate highway for several hours. Therefore, we find, in the present case, the Federal Motor Carrier Safety Regulation imposes a duty on USA Truck to properly maintain its vehicles to prevent frequent and extended breakdowns. The failure of USA Truck to follow the plain language of the Regulation was a violation of that duty and was a cause in fact of the accident. Accordingly, we find no merit in this argument by USA Truck.

Further, this finding is supported by the testimony of Jessie Theriot, a retired State Trooper, who is now an independent safety consultant. Mr. Theriot audits truck companies to assist them in complying with Department of Transportation rules and regulations. He examined the history of engine failure on the USA Truck and concluded:

8

The maintenance should have been done so that the truck should have been deadlined and should have been pulled off the roadway and really tore into. If the mechanical department or the maintenance department cannot take care of the problems, then that's when you contact your manufacturer.

After reviewing the maintenance records on the 18 wheeler, Mr. Theriot concluded USA Truck had a "set pattern pertaining to the vehicle maintenance problems" – a pattern of neglect. Even Donald Elrod, safety director for USA Truck, admitted the truck was likely to experience a breakdown on the road. He stated: "Well, looking at everything you've got here, like you said, just assuming what we've got and hypothetically, I would say that the vehicle was being operated, and it was likely to cause a breakdown."

Moreover, USA Truck placed an inexperienced driver behind the wheel with no means of communication in case of a breakdown. Mr. Voss was ill-equipped and untrained in emergency procedures. By remaining parked for hours on the unlit interstate shoulder at night, Mr. Voss created an unreasonable risk of injury to interstate travelers, especially motorists who are momentarily distracted and drift from the roadway onto the shoulder or those who may have to take refuge on the shoulder to avoid another highway hazard. The testimony established he broke down somewhere between 12:30 a.m. and 1:00 a.m. He had no way to notify state police of his location and the nature of the situation. He admitted it was foreseeable a motorist would drift from the roadway. Instead of walking the short distance for assistance at the Pilot Station, Mr. Voss made the decision to use the shoulder as a parking place to sleep for the evening in the security and safety of his big rig.

The supreme court has held the shoulder of the highway is to be used for temporary emergency situations or as a recovery center in case of an inadvertent drift off the roadway and not as a "safe harbor" for stranded motorists. *Shephard on Behalf of*

*Shephard v. Scheeler*, 96-1690 (La. 10/21/97), 701 So. 1308, 1318. In *Shephard,* a sixteen-year-old boy lost control of his vehicle and slammed into a parish dump truck which was parked on the shoulder. In finding liability on the part of the parish, the court stated:

> While we acknowledge that the Parish was not in violation of La.R.S. 32:296, this fact alone does not absolve it of liability. La.R.S. 32:296 is not a grant of immunity to public entities, and the shoulder of the highway is not a "safe harbor" for any public vehicle, even those on official business.
>
> The primary safety purpose of the paved shoulder of the highway is to provide an area for motorists who require a momentary stop, and to protect a motorist who inadvertently leaves the roadway.
>
> . . .
>
> We find the continuous use of a fixed area of the shoulder as a parking lot or a regular embarkation point Parish workers unreasonably impairs its safety function as a recovery area.
>
> . . .
>
> [T]he probability of the harm and gravity of the harm caused by the Parish's parking truck on the shoulder greatly outweighed the cost of avoiding the risk by parking elsewhere. The use of the shoulder in a consistent and continuous manner rather than a transitory manner, accompanied by the failure to utilize an available safe area to park the truck constituted an unreasonable risk of harm to motorists. We therefore hold that the Parish breached its duty to use the shoulder in a reasonably safe manner, and that this breach was a legal cause of the accident. The harm that occurred in the instant case was the very risk of harm contemplated by the duty to use the paved shoulder in a reasonable manner, namely that a vehicle that leaves the traveled portion of the highway would collide with a vehicle stopped in the recovery area.

*Id.* at 1318-19.

In *Monceaux v. Jennings Rice Drier, Inc.*, 590 So.2d 672 (La.App. 3 Cir. 1991), Johanna K. Monceaux was killed when she struck an unlighted, disabled rice truck parked on the shoulder of the interstate. The facts indicate, at approximately 3:00 a.m., Ms. Monceaux left Crowley and was traveling west toward her home in Egan. She apparently fell asleep and swerved off the roadway. When she attempted to gain control

of her vehicle and re-enter the roadway she struck the disabled rice truck parked on the shoulder. The testimony indicated the day before, Fred Loewer, owner of the rice truck, contacted Sheriff's Deputy Billedeaux. He requested that Billedeaux inform the proper authorities that the disabled truck would be left on the shoulder of Interstate 10 overnight. The Louisiana State Police gave permission to leave the rice truck on the shoulder. Following trial, the trial court found Ms. Monceaux 25% at fault, Mr. Loewer 30% at fault and the State 45% at fault in causing the fatality. The trial court awarded $225,000.00 to each parent for the death of their daughter. This court affirmed the award and the finding of liability on the part of Mr. Loewer and Officer Bernard of the State Police, stating:

> There is no doubt that the unmarked, unlighted truck parked on the side of I-10 at night posed a dangerous traffic situation and subjected motorists to an unreasonable risk of harm. . . . Since Officer Bernard knew about the possibility that a dangerous situation existed, he had a duty to protect motorists from the risk. *This duty extends not only to prudent, attentive drivers but to those who are momentarily inattentive or careless.*

*Id.* at 675 (emphasis added).

In *Rue v. State, Department of Highways*, 372 So.2d 1197 (La.1979), the supreme court allowed an inadvertent motorist to recover damages for her injuries when she drove onto a substandard shoulder. The court stated:

> A motorist has a right to assume that a highway shoulder, the function of which is to accommodate motor vehicles intentionally or unintentionally driven thereon, is maintained in a reasonably safe condition. Conversely, the Highway Department's duty to maintain a safe shoulder encompasses the foreseeable risk that for any number of reasons, including simple inadvertence, a motorist might find himself traveling on, or partially on, the shoulder.

*Id.* at 1199.

In the *Sumner* case, referred to above, this court found the emergency situation presented by defective wiper blades "justified Lowe's decision to *temporarily* park his eighteen-wheeler on the shoulder to tighten the wiper arm." *Id.* at 723 (emphasis added).

11

USA Truck attempts to absolve itself of liability by arguing the truck had reflectors strips on the side and back of the trailer and the driver placed two triangles on the shoulder. USA Truck and Mr. Voss created an unreasonably dangerous situation by remaining parked on the shoulder for an indefinite period of time. While the presence of reflector strips and triangles may have alerted an attentive driver who was passing the stalled vehicle, it cannot completely absolve USA Truck of liability in causing this accident. We find no merit in this argument. Therefore, we affirm the jury finding of liability on the part of USA Truck and Mr. Voss.

We disagree with the percentage of fault assessed by the jury to each of the parties and find USA Truck and Mr. Voss were a more substantial factor in causing the fatality. A jury's findings are entitled to great deference and should not be overturned unless manifestly erroneous. *Guillory v. Ins. Co. of N. Am.*, 96-1084 (La. 4/8/97), 692 So.2d 1029, *writ denied*, 01-2887 (La. 1/25/02), 807 So.2d 250. The manifest error rule also applies to a jury's allocation of percentage of fault. *Clement v. Frey*, 95-1119 (La. 1/16/96), 666 So.2d 607. However, when there is no reasonable basis in the record for the allocation of fault determined by the jury, reversal of the jury finding is warranted and the appellate court must decide the case *de novo*. *Davis v. Smith*, 35,117 (La.App. 2 Cir. 10/2/01), 796 So.2d 765. While we do not find Jason is completely free of fault in causing this accident, we find, based on the facts in the record, and the principles of law governing allocation of fault, the jury was clearly wrong in it apportionment of 75% fault to Jason and only 25% fault to USA Truck and David Voss.

Louisiana's comparative negligence provision is found in the La.Civ.Code art. 2323 and provides, in relevant part:

> In any action for damages where a person suffers injury, death, or loss, the degree of percentage of fault of all persons causing or contributing to the injury, death, or loss shall be determined, regardless of whether the person is a party to the action or a nonparty, and regardless of the person's

insolvency, ability to pay, immunity by statute, including but not limited to the provisions of R.S. 23:1032, or that the other person's identity is not known or reasonably ascertainable. If a person suffers injury, death or loss as the result partly of his own negligence and partly as a result of the fault of another person or persons, the amount of damages recoverable shall be reduced in proportion to the degree or percentage of negligence attributable to the person suffering the injury, death, or loss.

In determining percentage of fault, the supreme court has established guidelines for the trier of fact. In *Watson v. State Farm Fire and Casualty Insurance Co.*, 469 So.2d 967 (La.1985), the court cited the Uniform Comparative Fault Act, Section 2(b), which provides:

> In determining the percentages of fault, the trier of fact shall consider both the nature of the conduct of each party at fault and the extent of the causal relation between the conduct and the damages claimed.

The supreme court continued:

> In assessing the nature of the conduct of the parties, various factors may influence the degree of fault assigned, including: (1) whether the conduct resulted from inadvertence or involved an awareness of the danger, (2) how great a risk was created by the conduct, (3) the significance of what was sought by the conduct, (4) the capacities of the actor, whether superior or inferior, and (5) any extenuating circumstances which might require the actor to proceed in haste, without proper thought. And, of course, as evidenced by concepts such as last clear chance, the relationship between the fault/negligent conduct and the harm to the plaintiff are considerations in determining the relative fault of the parties.

*Id.* at 974.

*Watson* arose out of a hunting accident. Earl Creel's minor son shot and killed fifty-three year old Doyle Watson with a high-powered rifle. The jury found the decedent, Mr. Watson, 100% at fault in causing the accident by inadvertently walking across a field where he knew the young boy was hunting deer and in failing to wear bright colored clothing. The appellate court affirmed the jury verdict. The supreme court reversed and found the jury finding was clearly wrong. Of significance to the court was the fact that the action of Mr. Watson, "in walking along the field road within the

13

boy's rifle range, was inadvertent" and his failure to don hunters orange clothing "had only an indirect causative impact on the accident", while the actions of the boy's father, in failing to train and supervise his son in gun safely, were a deliberate failure. *Id*. The court stated:

> [N]one of the actions of Shane or his father Earl Creel can be considered inadvertent. They were aware that the high-powered rifle was deadly and that it was imperative to discern a target with certainty before firing. In a similar vein, the risk of firing or failing to train and supervise the firing of such a weapon had a direct potential for fatal consequences.

*Id*.

Moreover, the court found no possible excuse for Mr. Creel's failure to properly train and supervise his son in gun safety. The court stated:

> And, in considering possible mitigating factors, the Creels had no higher motive than sport when their acts of negligence occurred, and their actions were not dictated by any emergency or other circumstance which could lessen the fault attributed to this poor judgment.

*Id*.

Considering all the factors involved and applying the guidelines for allocation of fault, the court, in *Watson* assessed 20% fault to Mr. Watson and 80% fault to Mr. Creel and his son in causing the accident. Applying the guidelines of *Watson,* to the facts of this case, we find the conduct of Jason was inadvertent while the conduct of USA Truck was deliberate and "had no higher motive" than financial gain and the convenience of the driver. While the initial stop was dictated by exigent circumstances, the decision by Mr. Voss to remain parked on the shoulder for an extended period of time was negligent and created an unreasonable risk of injury to interstate travelers. His presence on the shoulder of the interstate foreclosed any opportunity Jason may have had to recover from his second or two of inadvertence and gain control of his vehicle.

Moreover, USA Truck and Mr. Voss were in a far superior position to remedy the situation. Had Mr. Voss been equipped with a working cell phone or CB radio, he could

14

have immediately called for help and had his vehicle removed from its hazardous position. USA Truck had ten opportunities to remedy the electrical problems with the truck, but failed to do so. When faced with the inevitable emergency situation, USA Truck's employee did not take any steps to attempt to notify the authorities or to prevent the tragedy that occurred.

In 1995, in *Campbell v. La. Dept. of Transp. & Dev.*, 94-1052 (La. 1/17/95), 648 So.2d 898, the supreme court again revisited the guidelines for determining an allocation of fault between the parties and articulated the doctrine of "more substantial factor." The facts in *Campbell* are as follows. Robert Campbell was a guest passenger in a vehicle being driven by Richard Ledford. Sometime been 4:30 a.m. and 5:00 a.m., Mr. Ledford fell asleep at the wheel. When he awakened he tried to get back on the roadway from the shoulder before he entered the Crib Creek Bridge. He was unable to do so and he struck the concrete abutment of the bridge. The bridge did not have guardrails. Mr. Campbell sued the Louisiana Department of Transportation and Development (DOTD). At trial, a road design engineer testified an unexposed concrete bridge abutment presented a hazard to motorists. He testified the purpose of a guardrail was to prevent a vehicle from slamming into the end of the bridge. Another expert testified guardrails would have substantially reduced the danger to a vehicle veering off the roadway and impacting the bridge. The court employed the duty-risk analysis and concluded the negligence of Mr. Ledford, in falling asleep at the wheel, did not absolve DOTD from liability. Moreover, of significance to the court was "DOTD knew of the fact that Crib Creek Bridge did not have guardrails, had reasonable opportunity to remedy the condition and failed to do so." *Id.* at 902. Because the actions of DOTD were deliberate, the court concluded the more substantial fault was with DOTD. The court stated:

> DOTD argues that the lack of guardrails did not cause Ledford to lose control of his vehicle and thus was not a cause-in-fact of the accident.

> DOTD would have us look no further than the negligence of Ledford in causing the accident. However, the failure of Ledford to maintain control of the vehicle does not relieve DOTD of its duty to keep the highways safe. This case involved one unfortunate *event* – a collision of the vehicle with the bridge. The negligence of Ledford in losing control of his vehicle as well as the failure of DOTD to place guardrails on the bridge combined to cause the harm to the guest passengers in the vehicle. The fact that more than one party can contribute to the harm is the reason for our comparative fault system. Clearly, DOTD's conduct in failing to place guardrails on Crib Creek Bridge was a substantial factor in causing the injuries to Campbell and the death of Frazier.

*Id.* at 902. The supreme court assessed Mr. Ledford with 25% fault and the DOTD with 75% fault.

In *Monceaux*, 590 So.2d 672, we again note, the trial court found Ms. Monceaux 25% at fault, Mr. Loewer 30% at fault and the State 45% at fault in causing the fatality and awarded $225,000.00 to each parent for the death of their daughter. This court in affirming the award and the finding of liability, however, held "in light of the *Watson* guidelines . . . that the major part of the fault lies with Fred Loewer in allowing the truck to remain on the highway unmarked in spite of the risk involved." *Id.* at 676. This court amended the judgment and found Mr. Loewer 50% at fault, the State 25% at fault and Ms. Monceaux 25% at fault.

When we compare *Monceaux* to the instant case, we are struck by their similarities. As with Ms. Monceaux, there is no evidence to indicate Jason had any culpability in causing the accident other than a second or two of inadvertence. On the other hand, USA Truck's actions can be compared with that of Loewer's, only USA Truck's actions are more aggravated. The truck had a record of numerous electrical problems and the company failed to remedy the trouble. Further, USA Truck did not provide Mr. Voss with any emergency communication equipment. Mr. Voss was ill-equipped and untrained to handle the situation presented on the evening of July 1, 2001, and the culpability for his behavior lies with USA Truck. Accordingly, we find 75% of

16

the fault for this accident lies with USA Truck and Mr. Voss and 25% lies with Jason.

*Damages*

USA Truck contends the trial court erred in granting a Judgment Notwithstanding the Verdict (JNOV) and raising the damage award to $250,000.00 to each parent. In determining whether the trial court properly granted a JNOV, the Louisiana Supreme Court in *Davis v. Wal-Mart Stores, Inc.*, 00-445 (La. 11/28/00), 774 So.2d 84, 89 has stated:

> A JNOV is warranted when the facts and inferences point so strongly and overwhelmingly in favor of one party that the court believes that reasonable jurors could not arrive at a contrary verdict. The motion should be granted only when the evidence points so strongly in favor of the moving party that reasonable men could not reach different conclusions, not merely when there is a preponderance of evidence for the mover.

We find no error in the trial court's judgment granting the JNOV or in the amount awarded to each parent. Jason Provost was twenty years old, the second of four children born to Joseph and Joanna Provost. His mother described him as full of fun and a "cut up." His father called him the kind of child any father would be proud of. Jason played basketball in elementary and high school. He volunteered as a coach for his younger brother's basketball team. The Provost family had a close and loving relationship with each other and with their extended family, including aunts, uncles, cousins and grandparents. The Provost family hosted all family functions for holidays and birthdays.

The Provost family home was the gathering place for the friends of the Provost children and, before this tragedy, was filled with laughter. The Provosts are devout Catholics and attended Mass together on a regular basis. Joanna is lector and Joseph serves as an usher. Jason worked full time after his high school graduation and planned to attend the University of Louisiana in the fall of 2001. Joanna is still haunted by the memory of her son and testified, at times, she can still smell the scent of him in her home.

17

We find the damage award of $250,000.00 to each parent reasonable and in keeping with other damages awarded in similar circumstances. *See Pinsonneault v. Merchants & Farmers Bank and Trust Company,* 99-12 (La.App. 3 Cir. 7/21/99), 738 So.172, where $350,000.00 was awarded to each parent for the wrongful death of their twenty-three year old son. *See also, Hasha v. Calcasieu Parish Police Jury*, 94-705 (La.App. 3 Cir. 2/15/95), 651 So.2d 865, *writ denied*, 95-667, 95-676 (La. 4/28/95), 653 So.2d 592, 593. Accordingly, we affirm the decision of the trial court granting the JNOV and increasing the award of damages.

*Expert Testimony*

USA Truck contends the trial court erred in allowing Jessie Theriot, plaintiff's expert, to testify. Louisiana Code of Evidence Article 702 provides, in relevant part:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

We find no error in allowing Mr. Theriot to testify regarding the rules and regulations applicable to the trucking industry and whether USA Truck failed to comply with these regulations. Mr. Theriot is retired from the Louisiana State Police with twenty-five years of law enforcement experience. He was the regional deputy commander for the Transportation and Environmental Safety Section. Upon his retirement with the state police he worked for eight years as safety manager for Venture Transport, a transportation company, overseeing compliance with federal and state regulations for the trucking industry. He is a trained safety auditor and has attended the United States Department of Transportation Auditing School. As an independent auditor, he reviews files that are maintained by trucking companies to determine whether they are in compliance with regulations. He has attended numerous safety seminars and is certified as a Fleet Safety Supervisor. A trial court is granted wide discretion in

deciding whether to allow a witness to testify as an expert and its decision will not be overturned absent clear error. *Abshire v. Wilkinson*, 01-075 (La.App. 3 Cir. 5/30/01), 787 So.2d 1158. We find no error in the decision of the trial court allowing Mr. Theriot to testify as an expert witness regarding federal and state safety regulations. Accordingly, we find this assignment of error without merit.

*Maintenance Records*

USA Truck contends the trial court erred in allowing its company maintenance records into evidence. USA Truck contends the records were not relevant. We disagree. The records were relevant to establish a pattern of negligent handling of maintenance problems on its fleet vehicle. We find this assignment of error without merit.

*Court Costs*

USA Truck contends the trial court erred in assessing all court costs to Defendants. The trial court has broad discretion in its allocation of court costs. *Boutte v. Nissan Motor Corp.*, 94-1470 (La.App. 3 Cir. 9/13/95), 663 So.2d 154. We find no error in this decision.

**DECREE**

Based on the foregoing review of the record, we affirm the decision of the trial court granting the JNOV and increasing the damage award to $250,000.00 for each parent. We reverse the judgment of the trial court and find USA Truck and Mr. Voss 75% at fault and Jason 25% at fault. In all other respects, the judgment of the trial court is affirmed. All costs of this appeal are assessed to USA Truck, Inc. and David Voss.

**AFFIRMED IN PART;**
**REVERSED IN PART; AND RENDERED.**