663 So.2d 154 (1995)
John Wilfred BOUTTE, Plaintiff-Appellee/Appellant,
v.
NISSAN MOTOR CORPORATION et al., Defendant-Appellant/Appellee.
No. 94-1470.
Court of Appeal of Louisiana, Third Circuit.
September 13, 1995.
*156 Michael John Mestayer, Stephen Francis Mestayer, New Iberia, for John Wilfred Boutte.
Carl Joseph Giffin Jr., Metairie, for Nissan Motor Corporation, et al.
Before: KNOLL, COOKS and PETERS, JJ.
COOKS, Judge.
Defendant in this products liability case appeals and seeks reversal of an adverse judgment. Plaintiff also appeals assigning as sole error that the jury's award is inadequate. For the following reasons, we amend and affirm as amended.

FACTS
On July 23, 1989 John Boutte (plaintiff) was returning to his home in Grand Marais, near New Iberia, when involved in a one-car accident. Boutte was travelling on Highway 90 when his 1987 Nissan Maxima left the roadway, travelled through the median, crashed over the concrete retaining wall of a culvert in the median knocking out a large piece of the wall, and stopped approximately 210 feet from the point where it left the roadway. As the car drove over the wall, the underbody of the automobile was damaged. After Boutte escaped from the vehicle, it was engulfed by fire. Boutte's ankles were severely fractured during the accident.
*157 The day before the accident, Boutte woke up at 5:00 a.m. and reported to work at 7:00 a.m. After working an eight-hour day, he returned home to eat, showered and dressed for a party. He drove to Lafayette to pick up his girlfriend. While at her home, Boutte consumed one straight drink of Crown Royal. Boutte and his girlfriend rode to New Iberia together for a Hawaiian luau where he consumed two more drinks of Crown Royal and coke. After the party, he dropped his girlfriend off at her home in Lafayette and began the return trip to Grand Marais. When his vehicle left the road at 2:10 a.m., Boutte had been awake for 21 hours.
Boutte filed suit against Nissan Motor Corporation (Nissan) alleging a defect in the brakes or steering of his automobile caused it to travel off the roadway. He later amended his petition alleging a defect existed in the passive restraint system of the automobile. Nissan argued there were no defects existing in Boutte's automobile. It asserted the automobile left the roadway because Boutte fell asleep while driving. Nissan further asserted Boutte's injuries were not caused by the restraint system.
The jury concluded Boutte's Maxima was defective and awarded him $450,000 damages. However, the jury assessed Boutte with 84% fault in causing the accident. The trial court cast Nissan with all costs. Nissan appeals the jury's verdict finding Boutte's automobile was defective and the judgment casting it with 100% of the costs. Boutte appeals the jury's fault assessment; and, he further contends the damage award is inadequate.

DISCUSSION

Expert Testimony
Nissan argues Boutte failed to establish by competent expert testimony there was a defect in the 1987 Maxima because he did not: (1) Prove a defect existed by way of competent expert testimony; (2) prove he sustained enhanced injuries as a result of an alleged defect; and (3) prove any design alternative would have prevented or lessened his injuries. Nissan also asserts it should not have been assessed any fault for Boutte's injuries.
It is well-settled that an appellate court may not set aside a trial court's or a jury's finding of fact in the absence of "manifest error" or unless it is "clearly wrong." When there is a conflict in the testimony, reasonable inferences of fact should not be disturbed upon review, even though the appellate court may believe its own evaluations and inferences are as reasonable. When there are two permissible views of the evidence, the fact finder's choice between them cannot be manifestly erroneous or clearly wrong. Rosell v. ESCO, 549 So.2d 840 (La. 1989).
Nissan argues the opinions of the plaintiff's expert should not have been relied upon because they were speculative. Nissan notes Boutte's expert never designed a motorized seat belt system or tested one nor did he perform any tests to support his opinions. Nissan acknowledges that the United States Supreme Court recently, in Daubert v. Merrell Dow Pharmaceuticals, Inc., ___ U.S. ___, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), rejected the rigid "general acceptance" test first memorialized, 72 years past, in Frye v. United States, 54 App.D.C. 46, 47, 293 F. 1013, 1014 (1923). The Frye test found life in "a short and citation-free 1923 decision concerning the admissibility of evidence derived from a systolic blood pressure deception test, a crude precursor to the polygraph machine." Daubert, supra at ___, 113 S.Ct. at 2793. Ruling inadmissible expert testimony relating to blood pressure as a "truth" indicator on test results, the Frye court stated:
"Just when a scientific principle or discovery crosses the line between the experimental and demonstrable stages is difficult to define. Somewhere in this twilight zone the evidential force of the principle must be recognized, and while courts will go a long way in admitting expert testimony deduced from a well-recognized scientific principle or discovery, the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs." 54 App.D.C., at 47, 293 F., at *158 1014 (emphasis added). Because the deception test had "not yet gained such standing and scientific recognition among physiological and psychological authorities as would justify the courts in admitting expert testimony deduced from the discovery, development, and experiments thus far made," evidence of its results was ruled inadmissible. Ibid.

Daubert, supra at ___, 113 S.Ct. at 2793.
Without joining ongoing debate on the Frye test's merits, the United States Supreme Court declared that the test was superseded by adoption of the Federal Rules of Evidence which drafting history "makes no mention of [Frye]." Daubert, supra at ___, 113 S.Ct. at 2794. Further, the Court stated "a rigid `general acceptance' requirement would be at odds with the `liberal thrust' of the Federal Rules and their `general approach of relaxing the traditional barriers to `opinion' testimony.'" Id. Federal Rule of Evidence 702 places primary responsibility on the trial judge to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." Daubert, supra at ___, 113 S.Ct. at 2795. The Louisiana Supreme Court adopted Daubert, supra, in State v. Foret, 628 So.2d 1116 (La. 1993) noting LSA-C.E. art. 702 is virtually identical to its source provision in the Federal Rule of Evidence 702. State v. Foret, 628 So.2d at 1121. Analyzing the Daubert decision, our State Supreme Court commented:
"The court replaced Frye with a new standard that requires the trial court to act in a `gatekeeping' function to `ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable.' Id. This requirement stems from a belief that the rules on expert testimony serve to relax `the usual requirement of first-hand knowledge' to ensure reliability on the part of a witness. ___ U.S. at ___, 113 S.Ct. at 2796. This relaxation is justified so long as `the expert's opinion (has) a reliable basis in the knowledge and experience of his discipline.' Id.

The reliability of expert testimony is to be ensured by a requirement that there be `a valid scientific connection to the pertinent inquiry as a precondition to admissibility.' Id. This connection is to be examined in light of `a preliminary assessment' by the trial court `of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether the reasoning or methodology properly can be applied to the facts in issue.' Id. The court went on to make some suggestions as to how a court could fulfill its gatekeeping role. These involve whether or not the technique had been subjected to peer review and/or publication, the `known or potential rate of error', the existence of `standards controlling the technique's operation', the technique's `refutability' or, more simply put, testability, and, finally, an incorporation of the Frye general acceptance in the scientific community as only a factor in the analysis. ___ U.S. at ___, 113 S.Ct. at 2797.
The court also stated that other rules of evidence govern this testimony, mainly F.R.E. 403's balancing test that will exclude probative evidence if outweighed by its potential for unfair prejudice. The Court noted the possibility that the expert's testimony can be quite misleading and prejudicial if this gatekeeping role is not properly satisfied, requiring a flexible approach and a careful evaluation of the methodology surrounding the testimony and its conclusions:
Conjectures that are probably wrong are of little use, however, in the project of reaching a quick, final, and binding legal judgmentoften of great consequence about a particular set of events in the past. We recognize that in practice, a gatekeeping role for the judge, no matter how flexible, inevitably on occasion will prevent the jury from learning of authentic insights and innovations. That, nevertheless, is the balance struck by Rules of Evidence designed not for the exhaustive search for cosmic understanding but for the particularized resolution of legal disputes. Id., ___ U.S. ___, 113 S.Ct. at 2798."
State v. Foret, supra at 1122 (emphasis added).
*159 We must presume that the trial judge performed his "gatekeeping function" in ruling admissible the expert testimony Nissan now complains should have been excluded. The soundness of his judgment in opening or closing the evidentiary gate on expert testimony rests squarely upon his knowledge and faithful performance of his duties which require him to beware and prevent admission of expert testimony based on mere conjecture or speculation; or which may be misleading to lay jurors unschooled in the scientific field advanced; or which potentials for unfair prejudice outweighs its probative value. Although Nissan complains mightily that the trial judge erred in allowing Boutte's expert to testify on matters which he possessed no first-hand knowledge, Nissan was not a hopeless victim standing on the battle line without strength to yell or shield to defend itself against the evidentiary attack it now assails as foul. Nissan could have relied on the arsenal of defenses available to itthe use of which has long been sanctioned in our adversarial system. The record convinces us Nissan was not prevented from challenging such testimony by "[v]igorous cross-examination [and] presentation of contrary evidence" and further seeking "careful instruction on the burden of proof." Daubert, supra at ___, 113 S.Ct. at 2798.
Boutte presented the testimony of William H. Muzzy III, as an expert in mechanical engineering with expertise in injury mechanics, occupant motion and restraint systems. Contrary to Nissan's assertions, Muzzy's opinions were based on his observations and experience while he researched and developed restraint systems. Muzzy is a mechanical engineer by education; and, he was involved in designing, building and operating a crash injury research facility that examined the effects of acceleration and deceleration on the human body at the Naval Biodynamics Laboratories (NBL) as chief engineer. The tests performed at the NBL used the same type restraint system automotive companies have to test the components of their restraint systems. Muzzy designed restraint systems for various types of crashes, i.e., frontal, side, ejection seat and multiple impact, for each facility. He currently works for a company that performs crash restraint evaluation and design work. Muzzy drew on these experiences and a published study to reach his conclusions regarding Boutte's accident and injuries. Muzzy's testimony concerned the relationship between Boutte's injuries and the restraint system. We find Muzzy's testimony had a reliable foundation; and, it was relevant.
Nissan presented the testimony of Dr. Charles Hatsell, a medical doctor who also obtained a Ph.D. in electrical engineering. Dr. Hatsell worked as a bench level scientist at an aerospace medical research laboratory studying the effects of sustained acceleration and impact on the human body. Also, he wrote protocols for medically monitored impact experiments involving human subjects. Dr. Hatsell, however, acknowledged he never tested restraint systems.
Muzzy testified the lap belt anchor point of Nissan's restraint system did not meet the requirements of Motor Vehicle Safety Standard 209, which provides the lap belt must stay on the occupant's pelvis in all cases including crashes and rollovers. When Boutte fastened the lap belt, it was positioned over his thighs. In Muzzy's opinion Boutte's legs slid forward during the accident and became entrapped by the knee bolsters located on the lower portion of the dashboard because the lap belt was not properly positioned on his pelvis. Muzzy concluded Boutte's ankles broke because of forces exerted on his legs when the underbody of his vehicle crashed into the concrete wall. Muzzy recommended the passive restraint system used in vehicles produced by General Motors as an alternative design, provided the anchor point is moved back to allow proper positioning of the lap belt over the occupant's pelvis.
On the contrary, Nissan's expert concluded Boutte's injuries were not caused by his knees becoming entrapped in the knee bolsters. Hatsell postulated Boutte's right ankle broke because it was on the brakes when the accident occurred. Hatsell testified Boutte's left ankle x-rays disclosed an evulsion fracture, which occurs when part of a bone is pulled off by an attached ligament. Hatsell reasoned Boutte's left foot was slightly *160 inverted while resting on the floor of the car, and his left ankle twisted as a result of the force it experienced during the accident. In Dr. Hatsell's opinion Boutte would have sustained the same injuries to his ankles even if the restraint system suggested by his expert was installed. As a consequence, Nissan urges the alleged defective restraint system was not a cause in fact of Boutte's injury; and it should not have been assigned any fault in causing his injuries.
Appellate courts should not reverse judgments of trial courts based on jury verdicts that are the products of considered choices between experts for plaintiffs and defendants. Williams v. General Motors Corp., 93-287 (La.App. 4 Cir. 6/15/94); 639 So.2d 275, writs denied, 94-1896, 94-1898, 644 So.2d 387, 388 (La. 11/11/94). We are satisfied Nissan's opportunity to challenge the expert testimony presented by Boutte was not thwarted or otherwise frustrated. The trial judge's later comments, which Nissan insists cast aspersions on the quality of Boutte's expert's testimony, do not persuade us after-the-fact to interfere with the jury's evaluation of the evidence once judged admissible by the gatekeeper. Our role on review is limited to determining whether the evidence had any reliable basis rooted in science to support its introduction and whether it was relevant to the issues advanced in the case. We cannot say the trial judge manifestly erred in admitting Boutte's expert's testimony; and we are prevented from second-guessing the jury's findings based on this evidence.

Jury Charge
Nissan also objected to the jury charge. LSA-R.S. 9:2800.56 provides in pertinent part:
A product is unreasonably dangerous in design if, at the time the product left its manufacturer's control:
(1) There existed an alternative design for the product that was capable of preventing the claimant's damage; and
(2) The likelihood that the product's design would cause the claimant's damage and the gravity of that damage outweighed the burden on the manufacturer of adopting such alternative design and the adverse effect, if any, of such alternative design on the utility of the product....
Nissan complains the trial court omitted the word "and" after reciting the first element and this omission may have caused the jury to believe Boutte only needed to satisfy one of the elements.
Adequate jury instructions are those which fairly and reasonably identify the issues and which provide correct principles of law for the jury to apply to those issues. The adequacy of jury instructions must be determined in light of the jury instructions as a whole. Doyle v. Picadilly Cafeterias, 576 So.2d 1143 (La.App. 3 Cir. 1991). An appellate court must exercise great restraint before overturning a jury verdict on the suggestion that the instructions were so erroneous as to be prejudicial. Aetna Life & Cas. Co. v. AMI-Electrical & Hoist Service, 93-1291 (La.App. 3 Cir. 5/4/94); 637 So.2d 173. After reviewing the trial court's instructions to the jury as a whole, we conclude Boutte's burden of proof and the defenses available to Nissan were fairly represented to the jury.

Fault
The jury assessed Boutte with 84% fault. Boutte complains he should not have been assessed any fault. He argues his injuries would have been minor but for Nissan's defective lap belt.
Boutte's accident reconstruction expert, Robert Eichler, did not find any evidence to support his claims that the brakes or steering was defective. However, he stated "some of the photos of damage to [the] wheels suggest tire or wheel damage before [Boutte's vehicle] went off the road." Boutte testified he told several people who assisted him after the accident he had a blowout. On the other hand, the State Trooper who investigated the accident (Woodrow Davis) testified the road surfaces did not evidence any signs that Boutte's vehicle left the roadway because of a tire blowout. Trooper Davis testified Boutte did not complain about the steering or the brakes; and, he did not indicate the vehicle's tire blew out at the scene of the accident. Trooper Davis noted Boutte *161 "apparently fell asleep" which he attributed as the sole cause of the accident.
It appears the jury accepted Nissan's evidence suggesting Boutte fell asleep while driving his vehicle after being awake for 21 hours, which caused him to travel off the road. On this record, we cannot say the jury manifestly erred in finding Boutte at fault for causing the accident. See Campbell v. Department of Transp. & Dev., 94-1052 (La. 1/17/95); 648 So.2d 898. However, under our comparative fault system, Boutte's fault in causing the accident does not relieve Nissan of liability for the harm occasioned by the defect existing in the vehicle's restraint system.
When apportioning fault, the trier of fact shall consider the nature of the conduct of each party at fault and the extent of the causal relation between the conduct and the damages claimed. Watson v. State Farm Fire & Cas. Ins. Co., 469 So.2d 967, 974 (La.1985). After considering the fault of the parties in causing Boutte's harm, we find Nissan has a greater degree of fault. Boutte's conduct set the accident in motion, but the jury concluded a defective restraint system caused the resulting harm to his ankles. This factual finding is not clearly wrong. However, the jury's allocation of fault between Boutte and Nissan was clearly wrong. The purpose of the restraint system was to prevent or substantially reduce the type of injury sustained by Boutte. When Boutte's vehicle left the roadway, he could not take any steps to prevent the risk of harm occasioned by the vehicle's impact with the concrete retaining wall and the ground below. Once the jury found the vehicle's restraint system was defective in design and this defect contributed to the injury Boutte sustained, Nissan's fault should have been assessed in relation to the injury sustained by Boutte rather than the cause of the accident. The record evidence convinces us that Nissan's fault was substantially greater than Boutte's in causing injury to his knee. Boutte's expert testified the injury he sustained would not have occurred or would have been reduced significantly if the vehicle's restraint system was not defective. The jury obviously found Boutte's expert's testimony on this issue more credible. Its factual findings, thus, compel that we reallocate fault in this case and assign Nissan 75% fault in causing Boutte's injury. Therefore, we amend the judgment to reduce Boutte's liability to 25% and increase Nissan's liability to 75%. Compare with Campbell, supra.

Damages
Boutte complains his lump sum award of $450,000 is inadequate to compensate him for the injuries he sustained. He argues after totalling the stipulated past medical expenses ($32,118.48), estimated possible future medical expenses ($15,000), estimated lost past earnings ($136,150), and estimated lost future earnings ($521,423), he has not been compensated for all of his estimated lost future earnings as well as pain and suffering.
The jurisprudence has held consistently, in assessing damages, much discretion is left to the judge or jury. On appellate review such awards will only be disturbed when there has been a clear abuse of discretion. Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976). It is only after an analysis of the facts discloses an abuse of discretion that an award, on appellate review, may be considered either excessive or insufficient. Reck v. Stevens, 373 So.2d 498 (La. 1979). An appellate court should modify a jury award only when it is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances. Youn v. Maritime Overseas Corp., 623 So.2d 1257 (La.1993), cert. denied, ___ U.S. ___, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994).
A lump sum judgment of damages is presumed to award all items of damages claimed, and the appellant's burden of proving the fact finder clearly abused its great discretion is more difficult than usual because the intention to award a specific amount for any particular item is not readily ascertainable. Taylor v. Dupree, 484 So.2d 986 (La.App. 3 Cir.), writ denied, 488 So.2d 201 (La.1986). The jury may not have awarded all of the estimated lost wages because it rejected some of the assumptions the economist used to reach his conclusions. *162 Further, as stated above, it is presumed the award included all items claimed. As such, we cannot say the jury abused its discretion in failing to award an adequate sum for any one item.
Boutte and Nissan cite cases awarding greater and lesser damages for allegedly similar injuries. Because we find the jury did not abuse its vast discretion in awarding damages, we are prevented from comparing the awards in the referenced cases with the present. Accordingly, we affirm the jury's lump sum damages award.

Costs
Boutte contends the costs assessed by the trial judge are inadequate. Nissan contests that portion of cost assessed to it for pretrial depositions that were not used during the trial and the playback of a videotaped deposition.
LSA-C.C.P. art. 1920 states the court may render judgment for costs, or any part thereof, against any party, as it may consider equitable. LSA-R.S. 13:3666 applies to compensation of expert witnesses who testified at trial. LSA-R.S. 13:4533 describes the expenses that can be taxed as costs.
The trial judge has great discretion in awarding costs (including expert witness fees, deposition costs, exhibit costs and related expenses). Veuleman v. Sims, 382 So.2d 245 (La.App. 3 Cir.1980). The trial judge is not required to set an expert witness fee at the amount charged by the expert witness. Veuleman, supra. The trial judge stated he believed the expert fees Boutte submitted were inflated. Therefore, he was not obligated to award the full amount requested.
Nissan asserts the pretrial depositions of Jarrod Segura, Julie Sonnier Dupis and David Bouillion are not taxable as costs because they were not used during the trial.[1] The trial judge may not award the cost for depositions not "used on the trial." See LSA-R.S. 13:4533; Moran v. Harris, 93-2227 (La.App. 1 Cir. 11/10/94); 645 So.2d 1248. Therefore, the award for costs is reduced by $341.48.
However, the trial judge properly exercised his discretion in awarding the costs of playing back a videotaped deposition. See Roy v. Gupta, 606 So.2d 940 (La.App. 3 Cir.), writ denied, 609 So.2d 232 (La.1992).
Nissan further argues it should not have been assessed all of the costs because it was found only 16% at fault by the jury. LSA-C.C.P. art. 1920 has been liberally interpreted as granting the trial court broad discretion in apportioning costs as it deems equitable. Davis v. State, DOTD, 94-308 (La.App. 3 Cir. 12/7/94); 647 So.2d 552, writ denied, 95-34 (La. 1/27/95); 649 So.2d 382. Although Boutte and Nissan were held at fault, we do not find the trial court abused its discretion in taxing Nissan with all of the costs. This conclusion is further buttressed by our decision to reallocate a greater percentage of fault to Nissan.

DECREE
For the foregoing reasons, the judgment of the trial court is amended to reflect an assessment of 25% fault to Boutte and 75% to Nissan. The costs taxed by the trial judge for Dupis', Segura's and Bouillion's depositions are reversed. The judgment is affirmed in all other aspects.
REVERSED IN PART; AMENDED IN PART.
NOTES
[1] Nissan also argued Lee Carr's deposition is not taxable as costs. However, the trial judge awarded costs associated with Carr's testimony. This was appropriate under LSA-R.S. 13:3666(A) because Carr testified as an expert witness.