# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

**21-459**

**BRYAN ARNOLD RICHMAN, JR.**

**VERSUS**

**THE TRAVELERS INDEMNITY COMPANY, ET AL.**

\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, NO. 2017-1756
HONORABLE SHARON DARVILLE WILSON, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

**D. KENT SAVOIE**
**JUDGE**

\*\*\*\*\*\*\*\*\*\*

Court composed of D. Kent Savoie, Van H. Kyzar, and Jonathan W. Perry, Judges.

**AFFIRMED.**

**David J. Calogero**
**David J. Calogero, APLC**
**202 Magnate Drive**
**Lafayette, LA 70508**
**(337) 298-0240**
**COUNSEL FOR DEFENDANTS/APPELLANTS:**
    **Shannon T. Rhodus**
    **Climax Portable Machine Tools, Inc.**
    **The Travelers Indemnity Company**

**Steven Broussard**
**Michael J. Williamson**
**Rachel K. Couvillion**
**Broussard & Williamson**
**1301 Common Street**
**Lake Charles, LA 70601**
**(337) 439-2450**
**COUNSEL FOR PLAINTIFF/APPELLEE:**
    **Bryan Arnold Richman, Jr.**

**SAVOIE, Judge.**

In this car accident case, Defendants Shannon Rhodus, Climax Portable Machine Tools, Inc. ("Climax"), and The Travelers Indemnity Company ("Travelers") appeal the trial court's judgment granting Plaintiff Bryan Richman, Jr.'s Motion for Judgment Notwithstanding the Verdict ("JNOV"), increasing the jury's award of general damages, and assessing all of Plaintiff's requested court costs to Defendants. Defendants also appeal the denial of their exception for improper venue. For the following reasons, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

On May 12, 2016, Mr. Richman was involved in a car accident in Gonzalez, Louisiana, wherein he was rear-ended by Mr. Rhodus while stopped at a stop light. At the time, Mr. Richman was driving a 2013 GMC Sierra, and Mr. Rhodus was driving a Ford F-250, which was owned by Mr. Rhodus's employer, Climax. According to Mr. Rhodus, he was travelling between ten and fifteen miles per hour at the time of the accident.

Mr. Richman claims that, as a result of the accident, he suffered from two herniated cervical discs at levels C5-6 and C6-7. He underwent conservative treatment for two years, including chiropractic care, physical therapy, two cervical epidural injections, a medial branch block, and a radiofrequency ablation. He then underwent a two-level cervical disc replacement surgery in June 2018.

On April 28, 2017, Mr. Richman filed suit against Defendants herein.[1] Defendants filed an Answer on June 1, 2017.

---

[1] Mr. Richman also named as Defendants, Phoenix Insurance Company ("Phoenix"), a subsidiary of Travelers, and his auto insurer, Farmers Insurance Exchange, as Defendants in these proceedings; however, claims involving these Defendants are not currently before this court and will not be discussed herein.

On March 8, 2018, Mr. Richman filed a motion for summary judgment seeking a ruling that Mr. Rhodus was solely liable for the subject accident.

Thereafter, on March 28, 2019, Defendants filed a Declinatory Exception of Improper Venue. They argued that Mr. Richman falsely claimed that he was domiciled in Calcasieu Parish, when he was actually domiciled in Livingston Parish, and therefore Calcasieu Parish was not a proper venue for this action. Rather, according to Defendants, venue was proper in either Livingston Parish, which was the domicile of Mr. Richman and Mr. Rhodus, or Ascension Parish, which was the location of the accident and where Climax's principal place of business was located. Defendants argued that even though their exception was filed after their Answer, the exception should not be considered as waived in accordance with La.Code Civ.P. art. 928 because Mr. Richman made intentionally false and misleading statements about his domicile.

A hearing on Defendants' exception was held May 30, 2018. The trial court denied Defendants' venue exception in open court, stating as follows:

> The Court found the plaintiff to be very forthright. I found him to just be extremely forthcoming and just attempting to honestly answer questions that were being propounded to him. . . . .
>
> I think this case is just how it appears . . . a plaintiff, lay person, giving information to his attorney about where he resides at the time that the attorney is filing and drafting pleadings. I believe the plaintiff's testimony and I believe that he was living in a transition, clearly. I do not believe he had any intent of returning to the [Livingston Parish] address. . . . I believe his testimony when he said he intended to remain in Sulphur [in Calcasieu Parish] as long as he was working for however long that lasted.

Defendants thereafter filed a writ application with this court and further sought a stay of the trial court's proceedings. On September 5, 2018, this court denied both the writ application and the request for a stay, stating "[w]e find no

error in the trial court's ruling." *Richman v. The Travelers Indemnity Co.*, 18-525 (La.App. 3 Cir. 9/5/18)(unpublished writ), *writ denied,* 18-1599 (La. 12/17/18), 259 So.3d 345. The Louisiana Supreme Court subsequently denied writs.

Meanwhile, on May 31, 2018, Mr. Richman filed a Motion for Summary Judgment seeking a ruling that Mr. Rhodus was solely at fault in causing the accident. Mr. Richman also filed a Motion for Summary Judgment on the issue of insurance coverage. Following a hearing on September 17, 2018, the trial court rendered judgments granting both motions.

A four-day jury trial on the issue of damages was held September 16, 2019, through September 19, 2019. Ultimately, the jury rendered a verdict on the verdict form as follows (gridlines removed), and a judgment on the verdict was rendered on October 23, 2019:

**Bryan Richman's Past Economic Damages**      $137,400.77
- medical expenses

**Bryan Richman's Past Non-Economic Damages**      $50,000
- physical pain and discomfort
- loss of enjoyment of life
- inconvenience and disruption
- mental and emotional distress

**Bryan Richman's Future Non-Economic Damages**      $200,000
- physical pain and discomfort
- loss of enjoyment of life
- inconvenience and disruption
- mental and emotional distress

Thereafter, on November 18, 2019, Mr. Richman filed a Motion for Judgment Notwithstanding the Verdict, Alternatively Motion for New Trial and Additur. Mr. Richman argued that the jury's award of $50,000 for past non-economic damages was abusively low and inconsistent with the jury's finding that Mr. Richman was entitled to the full cost of his medical expenses, including

expenses for physical therapy, epidural steroid injections, a medial branch block, a radiofrequency ablation, and a two-level cervical disc surgery. Mr. Richman alternatively argued that defense counsel's "inflammatory remarks were used to improperly sway the jury and certainly warrant a new trial[,]" even if the trial court were to deny his Motion for JNOV.

On November 19, 2019, Mr. Richman filed a Motion and Order to Tax Costs, seeking costs and expenses. The trial court rendered judgment on January 29, 2020, awarding Mr. Richman with the "full amount of the preparatory and trial related expenses as submitted totaling $55,155.47, to be paid by Defendants."

On March 24, 2020, the trial court rendered a judgment granting Mr. Richman's Motion for JNOV, and "increasing the jury's award for past non-economic damages to the sum of $300,000 and awarding damages for loss of enjoyment of life in the amount of $100,000[.]"

Defendants appeal, and assert the following as assignments of error:

1. The District Court Committed Error for Granting JNOV[.]

2. The District Court Committed Error Awarding All Costs to Plaintiff[.]

3. The District Court Committed Error Denying Defendants' Exception of Improper Venue[.]

## ANALYSIS

Exception of Improper Venue

We will first consider Defendants' third assignment of error wherein they seek additional review of the trial court's denial of their exception of improper venue. As noted above, this court previously denied Defendants' writ application, finding no error in the trial court's ruling, and the Louisiana Supreme Court also denied Defendants' writ application on this issue.

Defendants' arguments on appeal are nearly identical to the arguments previously submitted to this court and to the Louisiana Supreme Court in connection with their writ applications. Specifically, Defendants argue that even though their exceptions were not filed until after their Answer, their exception should not be considered as waived in accordance with La.Code Civ.P. art. 928 because Mr. Richman "falsely claimed in the original petition that he was domiciled in Calcasieu[,]" and he should not be allowed to benefit "by misleading defendants not to object to venue." Defendants further argue that Mr. Richman's domicile was actually Livingston Parish, as he never had any intent to remain in Calcasieu Parish. In support thereof, Defendants cite to evidence and testimony from the trial court's May 30, 2018 hearing on Defendants' exceptions.

"'[A]n appellate court will ordinarily not reconsider its own rulings of law on a subsequent appeal in the same case[,]'" in accordance with principles of law of the case. *Juneau v. State*, 06-1653, p. 6 (La.App. 3 Cir. 5/2/07), 956 So.2d 728, 733, *writ denied*, 07-1177 (La. 9/14/07), 963 So.2d 1004, quoting *Petition of Sewerage & Water Bd. of New Orleans*, 278 So.2d 81, 83 (La.1973) (emphasis removed). "'Nevertheless, the law of the case principle is applied merely as a discretionary guide: Argument is barred where there is merely doubt as to the correctness of the former ruling, but not in cases of palpable former error or so mechanically as to accomplish manifest injustice.'" *Id.*(emphasis removed).

We find no palpable error in either the trial court's denial of Defendants' exception of improper venue, or this court's prior denial of Defendants' writ application, which was further denied by the Louisiana Supreme Court. Further, Defendants have not otherwise suggested that they have suffered a manifest

injustice by going forward with this case in Calcasieu Parish. Rather, as noted in *Juneau*, *Id.* at 735:

> Not only would a finding of improper venue be a heavy burden on [Plaintiff], it would also be a violation of traditional notions of fairness to [Plaintiff]. . . . [R]ather than have to abide by a judgment reached in an otherwise fair and equitable trial, the defendants are asking that we vacate that judgment and give them a second chance to be heard. [Plaintiff], in effect, would have to win his case twice while the defendants would only have to defend themselves successfully once. Such a result does not rest comfortably with traditional notions of fair play and substantial justice.

Therefore, we find no merit in Mr. Richman's third assignment of error and affirm the trial court's denial of Defendants' venue exception.

JNOV

We will next review the trial court's judgment granting Mr. Richman's motion for JNOV, increasing the jury's award of general damages.

As stated in *Smith v. State, Department. of Transportation & Development*, 04-1317, 04-1594, p. 12-13 (La. 3/11/15), 899 So.2d 516, 524-526 (alteration in original):

> La.Code of Civil Procedure art. 1811 provides for the trial court's use of JNOV. A JNOV may be granted on the issue of damages or the issue of liability or it may be granted on both issues. *Davis v. Wal-Mart Stores*, *Inc.*, 00-0445, p. 4 (La.11/28/00), 774 So.2d 84, 89. The grounds upon which the district court may grant a JNOV are not specified in Article 1811; however, this court has set forth the standard to be used in determining when a JNOV is proper as follows:
>
> > [A] JNOV is warranted when the facts and inferences point so strongly and overwhelmingly in favor of one party that the trial court believes that reasonable persons could not arrive at a contrary verdict. The motion should be granted only when the evidence points so strongly in favor of the moving party that reasonable persons could not reach different conclusions, not merely when there is a preponderance of evidence for the mover. The motion should be denied if there is evidence opposed to the motion which is of such quality and weight that

reasonable and fair-minded persons in the exercise of impartial judgment might reach different conclusions. In making this determination, the trial court should not evaluate the credibility of the witnesses, and all reasonable inferences or factual questions should be resolved in favor of the non-moving party.

*Trunk v. Medical Center of Louisiana at New Orleans*, 04-0181, pp. 4-5 (La. 10/19/04), 885 So.2d 534, 537 (citing *Joseph v. Broussard Rice Mill, Inc.*, 00-0628, pp. 4-5 (La.10/30/00), 772 So.2d 94, 99). The JNOV strict criteria is predicated on the rule that "when there is a jury, the jury is the trier of fact." *Trunk* at p. 5, 885 So.2d at 537.

When reviewing a district court's grant of a JNOV, an appellate court must initially determine whether the district judge erred in granting the JNOV by employing the above-mentioned criteria in the same manner as the district judge in deciding whether to grant the motion. *VaSalle v. Wal–Mart, Stores, Inc.* 01-0462, p. 11-12 (La. 11/28/01), 801 So.2d 331, 339. In other words, the appellate court must determine whether the facts and inferences adduced at trial point so overwhelmingly in favor of the moving party that reasonable persons could not arrive at a contrary finding of fact. *Id.* at p. 12, 801 So.2d at 339. If the answer is in the affirmative, then the appellate court must affirm the district court's grant of JNOV. *Joseph* at p. 5, 772 So.2d at 99. However, if the appellate court determines that reasonable minds could differ, then the district judge erred in granting the JNOV and the jury verdict should be reinstated. *Id.*

In connection with his Motion for JNOV, Mr. Richman challenged only the jury's $50,000 award for past non-economic damages, which, according to the jury verdict form, was to incorporate damages for past physical pain and discomfort, past loss of enjoyment of life, past inconvenience and disruption, and past mental and emotional distress. The jury instructions further indicated that past damages were damages Mr. Richman "has already suffered," and that future damages were damages "that he will more likely than not suffer in the future."

At trial, Mr. Richman testified that on May 12, 2016, the day of the accident, he was stopped at a stop light for between ten and twenty seconds, he picked up his phone to check it for messages, and then was rear-ended by a Ford F-250 truck driven by Mr. Rhodus. He stated that his phone hit his face, he chipped his tooth,

7

he thought he had "a busted lip," and the accident "pushed my truck a pretty good ways up . . . . I'm not exactly sure how I didn't hit the person in front of me[.]" Mr. Richman further testified that, as a result of the accident, his seatbelt locked. Pictures of both Mr. Richman's and Mr. Rhodus's trucks taken following the accident were submitted into evidence.

Mr. Richman testified that he has suffered from pain in his "left arm, left triceps going down my forearm into my fingers and my neck[]" as a result of the accident. Following the accident, he underwent approximately two years of conservative treatment; however, in light of continuing symptoms, he ultimately underwent a two-level cervical disc replacement surgery in June 2018, which he indicated provided him with relief and was successful.

At trial, all three spine doctors who testified agreed that Mr. Richman sustained injuries to his cervical spine as a result of the accident and that he needed surgery to relieve his symptoms; however, they disagreed as to the necessity of all of the conservative treatment rendered, the type of the surgery needed, and whether cervical surgery was needed at both the C5-6 and C6-7 levels, rather than just at C6-7. Ultimately, the jury concluded that Mr. Richman was entitled to economic damages in the amount of $139,400.77, which was the total amount of medical bills he incurred for the two years of conservative treatment following the accident, as well as the two-level disc replacement surgery he underwent in June 2018.

In addition to awarding Mr. Richman the full amount medical bills he incurred, the jury also awarded him with $50,000 for past non-economic damages. This is the amount that defense counsel suggested during closing argument was appropriate, after arguing that the total amount of medical bills submitted should be reduced by $31,255 for surgery at the C5-6 level and/or other treatment that was

not necessary. Defense counsel argued that $50,000 was sufficient to compensate Mr. Richman for his pain and suffering "for low to mid range or middle-low range damages and pain before his surgery. . . . That's two years."

Neither party has challenged the amount of the medical damages awarded by the jury. However, Mr. Richman submitted to the trial court a Motion for JNOV on the issues of past non-economic damages. In granting that motion, the trial court stated:

> At the conclusion of the trial, the jury awarded the entire amount of the past medicals incurred by plaintiff but awarded the past non-economic damages suggested by defendant in closing argument that defendant argued was commensurate for partial medicals. Accordingly, it is clear to this Court that the jury found that the plaintiff was in fact injured by the crash, and that the jury clearly rejected the defense[']s position that plaintiff underwent an unnecessary surgery. . . . Notwithstanding the award of past medicals, the jury did not award an amount [of] past non-economic damages that adequately reflects plaintiff's injuries and treatments in the interim between the accident and the trial. Although not evidenced by the award of past medicals, these conflicting awards [of past non-economic damages] indicate that the jury agreed with the defense's theory that plaintiff underwent an unnecessary surgery. Accordingly, this Court finds the jury's award as inconsistent and irreconcilable.

We likewise find that the jury's award of the full amount of Mr. Richman's medical bills conflicts with its award of past non-economic damages in the amount suggested by defense counsel. Therefore, the trial court's judgment granting Mr. Richman's motion for JNOV was proper. The jury's award of $50,000 for past non-economic damages cannot be reconciled with the award for the full amount of the medical bills or the evidence presented, and it is unreasonable, as it fails to compensate Mr. Richman for non-economic damages commensurate with his injuries and treatment.

As noted in *Langlinais v. Leblanc*, 18-712, p. 3 (La.App. 3 Cir. 4/17/19), 272 So.3d 896, 900, *writ denied*, 19-1136 (La. 10/21/19), 280 So.3d 1137.

9

If a trial court properly grants a JNOV, it becomes the trier of fact and makes "an independent assessment of the damages and award[s] a proper amount of compensation under the facts of the particular case." *Anderson v. New Orleans Pub. Servs., Inc.*, 583 So.2d 829, 834 (La. 1991). On appeal, the trial court's damage awards are reviewed under the abuse of discretion standard. *Id.* Pursuant to the abuse of discretion standard of review, the appellate court considers the damage awards in light of the facts and circumstances of the particular case before the court. *Miller v. LAMMICO*, 2007-1352 (La. 1/16/08), 973 So.2d 693. Consideration of prior damage awards is appropriate only if the review of facts shows an abuse of discretion by the fact finder. *Id.*

The abuse of discretion standard of review applicable to a trier of fact's award of general damages was more fully explained in *Allison v. CITGO Petroleum Corp.*, 19-523, pp. 6-8 (La.App. 3 Cir. 12/18/19), 286 So.3d 1152, 1161, *writ denied*, 20-123 (La. 3/9/20), 294 So.3d 482:

> As stated by this court in *Thibeaux v. Trotter*, 04-482, p. 3 (La.App. 3 Cir. 9/29/04), 883 So.2d 1128, 1130, *writ denied*, 04-2692 (La. 2/18/05), 896 So.2d 31:
>
> > . . . General damages, are speculative in nature and, thus, incapable of being fixed with any mathematical certainty. They include pain and suffering, physical impairment and disability, and loss of enjoyment of life. *Wainwright v. Fontenot*, 00-0492 (La. 10/17/00), 774 So.2d 70. . . .
>
> General damages are reviewed for an abuse of discretion because the trial court "is in the best position to evaluate witness credibility and see the evidence firsthand." *Bouquet v. Wal-Mart Stores, Inc.*, 08-309, p. 4 (La. 4/4/08), 979 So.2d 456, 459. The role of an appellate court in reviewing a general damages award is not to decide what it considers to be an appropriate award but rather to review the exercise of discretion by the trier of fact." *Cormier v. Citgo Petroleum Corp.*, 17-104, p. 4 (La.App. 3 Cir. 10/4/17), 228 So.3d 770, 776, *writ denied*, 17-2138 (La. 2/9/18), 237 So.3d 491. The trier of fact has great, even vast discretion in awarding general damages. *Youn v. Maritime Overseas Corp.*, 623 So.2d 1257 (La.1993), *cert denied*, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994).
>
> "Mental anguish and grief refers to the 'pain, discomfort, inconvenience, anguish, and emotional trauma' that accompany the injury. *McGee [v. A C And S, Inc.*, 05-1036, (La. 7/10/06), 933 So.2d 770,] 775." *Rachal v. Brouillette*, 12-794, p. 5 (La.App. 3 Cir. 3/13/13), 111 So.3d 1137, 1142, *writ denied*, 13-690 (La. 5/3/13), 113

10

So.3d 217. Further, "[l]oss of enjoyment of life ... refers to the detrimental alterations of the person's life or lifestyle or the person's inability to participate in the activities or pleasures of life that were formerly enjoyed prior to the injury." McGee, 933 So.2d at 775. "[W]hether or not loss of enjoyment of life is recoverable depends on the particular facts of the case, and should be left to the district court's discretion on a case-by-case analysis." Id. at 779. Additionally, in reviewing a general damage award, "a court does not review a particular item in isolation; rather, the entire damage award is reviewed for an abuse of discretion, and if the total general damage award is not abusively high, it may not be disturbed." Pennison v. Carrol, 14-1098, pp. 14-15 (La.App. 1 Cir. 4/24/15), 167 So.3d 1065, 1078, writ denied, 15-1214 (La. 9/25/15), 178 So.3d 568.

Mr. Richman testified that prior to the accident, he led a very active lifestyle. He testified that he was in "pretty good physical shape[]" and that he routinely participated in rugged outdoor activities such as hunting, hiking, river rafting, ice climbing, and rock crawling.

Mr. Richman further testified as to his passion for competitive shooting that started a young age. He explained that shooting was a stress reliever for him. He noted that for several years prior to the accident, he routinely competed in the Precision Rifle Series (PRS) competition events, where he often earned high ranking placements and received awards. He explained that PRS events typically require shooting from a prone position as that is the most accurate position from which to shoot. He testified that "[y]ou have to lift your head -- your spine is basically parallel to the ground and you have to lift your head -- your neck and your head up to look through your rifle scope."

Mr. Richman testified that immediately after the accident, he was "sore," but that he did not think he needed to see a doctor right then. He then stated he was "pretty sore" the next day, and that he was "extremely sore" during his competitive shooting competition that weekend but figured that would happen after the accident. He explained that he had planned to attend the competition six to eight

11

months in advance, that his hotel room had been paid, he had trained for the event, and that he was not going to let being sore stop him.

Mr. Richman testified that two weeks following the accident, he was only getting two hours of sleep as he was constantly waking up from pain, but that "you gotta work, you gotta suck it up. You gotta do what you gotta do." He then shot another competition three or four weeks later, but on the drive back home, he "just couldn't get comfortable[,] which had "never been an issue[.]" According to Mr. Richman, his friends travelling with him also noted that he seemed to be in pain.

He thereafter sought treatment with a chiropractor. However, after receiving no relief, the chiropractor referred him to Dr. Billy Mae, who then referred him for X-rays and physical therapy with Lucien Lewy. Mr. Richman explained that during physical therapy, he had to perform exercises that stretched the muscles in his neck and inherently caused the pain levels in his neck to elevate during each session. He attended regular physical therapy sessions in July, August, September, and October 2016, and reported some relief.

With respect to daily activities during this time, Mr. Richman testified that he worked in the construction and industrial field and that his job involved finding, bidding, and billing jobs. He explained that his job required him to consistently look down at drawings, and the more he looked down, the worse the pain got. He also noted that he was "a little snappy[]" with his coworkers due to a lack of sleep.

Mr. Richman also testified that while he did have trouble sleeping prior to the accident because his "brain wouldn't shut off" and he was constantly thinking, he explained that after the accident, he could not sleep because "it was actually pain keeping me up." He stated that he would, at most, get two hours of sleep each

12

night, whereas before the accident, he would get five hours of sleep and could sometimes catch up.

Mr. Richman testified that after he began physical therapy in July 2016, his initial reported pain levels of between 6 and 8 out of 10, decreased to 3 or 4 out of 10, and that he had reported to the physical therapist that he was having better days in October 2016. He continued physical therapy through approximately November of 2016; however, according to Mr. Richman, he stopped after the insurance company indicated it would not pay for his therapy.

Mr. Richman testified that he attended a shooting competition in October 2016. When asked why, he said that he did not feel like he should stop his life just because he was hurting, and that he was going to do what he could to the best of his ability. He further testified that following the October 2016 competition, his neck and arm were physically hurting and he was not sleeping very well due to pain, but at least he was doing something he loved to do. He stated that prior to the accident, he did not feel like this after shooting competitions.

Mr. Richman also testified that sometime after a physical therapy appointment in November 2016, when he reported feeling better, he rode a child's roller coaster with his four-year-old stepson at a birthday party. He stated that a couple of days later he "was feeling a little bit more stiff[,]" but did not call his doctor. Mr. Richman also indicated that at one point, when putting on his belt, he looked towards his right to thread the belt through the loop and felt "something" in his neck that immediately "shot" pain into his neck, triceps, and forearm.

He thereafter contacted his doctor, who referred him to physical therapy, as well as to Dr. Scrantz, who is a neurosurgeon. Mr. Richman testified that it was his understanding from his doctors that he had a herniated cervical disc, and while

13

he could not "re-injure" it, "[y]ou may experience more pain from it. . . . There's nothing you can do to cause more damage." He further testified that when he learned that he was being referred to a neurosurgeon:

> [I]t's definitely a high anxiety kind of deal. Because . . . I was feeling a little bit better so my hopes were kind of up that all this is behind me. It's obviously not, so now we're getting a neurosurgeon involved. . . . That's not your normal family doctor. . . . [Y]ou start to worry about the what ifs a lot more."

Mr. Richman testified that his pain levels at this point in time were 5 or 6 out of 10 a lot of times, but also a 2 or 4 out of 10 a lot of times. He explained that his pain levels would go up and down over time and were affected by his daily activities. He further explained that the longer he lived with the pain, "the more dull you become to it." His pain levels as reported to his doctors prior to surgery were generally a 4 or 5 out of 10.

Mr. Richman explained that his neurosurgeon, Dr. Scrantz, performed two steroid injections, which then led to the medial branch block, then to the radio frequency ablation (RFA), and "that led to the point where we started talking about surgery[.]" He testified that he "got a little bit of relief from the first steroid injection[,] but "did not hardly get any relief from the second one[,]" and "[t]he block did help some[.]"

According to Mr. Richman, he "didn't go under for any of those procedures[,]" and he "didn't take any Valium or anything like that. So, [he] got to experience it in high definition." He also explained that he was given a local anesthetic at the location where the needles were stuck into his neck during these procedures, and that while he did not feel any pain, he did "actually. . . feel the needle and . . . hear the crunching of bone and stuff like that[.]"

Mr. Richman further testified that he got a "pretty decent amount of relief" from the "nerve burn," or RFA, and that his doctor explained that he could expect six months to a year of relief from it. However, after about two and one-half to three months, his symptoms started coming back, and that is when he and his doctor started discussing the possibility of surgery. When asked what ultimately made him decide that surgery was the right choice for him, Mr. Richman stated:

> Well, the lack of just being normal. You're always in pain. Your triceps are burning. Your fingers are numb or tingling. Just doing your regular work that never bothered you before bothers you and then just not being able to do the things that you really enjoy doing. Those options really start coming off the table.

Mr. Richman also testified that because of pain, he was "irritable" and "cranky," and he would "kind of snap" with his wife and stepsons without meaning to, which bothered him. He further explained that his pain was:

> [N]ot just a . . . one or two day deal to where you work through it. It's everyday's a constant grind, way harder than it should be. Where just looking down at your work that never bothered you before, it's grinding on your nerves to the point that you basically have to take a step back and shut your mind off to try to tune out the pain to get back to focus on work. The things that you just can't focus on because the pain is there. That's disruptive to me to not do -- to go out and shoot like you want to. Shooting's a stress reliever for me. It's an obsession for me. That outlet's gone. I don't have that outlet.

With respect to competitive shooting, Mr. Richman testified that his last competition was in January 2017, which was the finale, and that he had to earn his way into the competition by top finishes in prior competitions. When asked if he could lay in the prone position, he stated that he tried but "as soon as I did, I did get a pretty sharp pain in my neck. So, I aborted that and went to a table to finish shooting." He explained that laying prone is required to shoot the PRS because it provides the most accuracy.

15

Mr. Richman ultimately underwent a two-level disc replacement surgery with Dr. Blumenthal in June 2018. He explained that Dr. Scrantz did not perform such surgeries. In his follow up appointments with Dr. Blumenthal, his reported pain levels were between 1 and 3 out of 10.

Trial was held in September 2019, just over a year after his surgery. Mr. Richman testified that as of the day of trial, he felt that he was "70% to 80% of what [he] was before the wreck," and that while his "daily life isn't the best at sometimes, it's way better than what it was." He explained that on a normal day, he wakes up between two and four times per night to adjust his pillow and sometimes he will wake up with a sharp pain in his neck. He also explained that on a good day, when he is "not looking at a lot of specs, a lot of prints" at work, he has a pretty decent day; however, if he has to look down for four or five hours, which happens regularly, by lunch time, he has to take Aleve, and then the drive home is "not as enjoyable" and "a lot more painful" than his drive to work.

Mr. Richman further described his pain on the day of trial as having three fingers that are still numb and "a pretty good burning sensation through my tricep[s] right now just from not walking around, getting loose." He explained that he typically tries to get up and walk around every hour at work to loosen up.

Mr. Richman also testified that after the surgery he was not able to pick up anything weighing more than ten pounds for six to twelve weeks. Therefore, he was not able to pick up his youngest stepson. He also explained that as of the date of trial,

> if we go play in the pool or something like that, he [his stepson] wants me to throw him up. . . . I could do probably . . . five to ten minutes before I start really hurting and I have to tell him I have to quit. . . . I can't really roughhouse with him.

Mr. Richman also testified at trial that while there is nothing that he is completely incapable of doing, the things he does do cause pain. He explained:

> [I]t's kind of one of those deals. You work up to your whole point in life. Someone says from this point forward or this point back, you did everything you wanted to do, no questions asked, you might have [an] ache or pain because you -- you know worked out too hard one day, got some lactic acid built up in your muscles, things like that. No pain, no gain kind of thing. So, you had all that, but to this point, this isn't a lactic acid build up thing, this isn't sore muscles, this isn't no pain, no gain . . . this is the pain that's there. You start doing it, you start hurting. You don't have the freedom to . . . live your life the way you've lived it before.

With respect to shooting, Mr. Richman testified that after surgery in June 2018, Dr. Blumenthal initially restricted him from shooting, and that at the six-month mark, Dr. Blumenthal "said that he felt pretty comfortable with me doing it at that point in time[;]" however, Mr. Richman chose to wait a year before shooting again. As of trial, he had resumed shooting and had shot three times since July 2019. Mr. Richman indicated that he has not given up on shooting, or on life.

Mr. Richman also testified that he was in a second car accident in August 2019, wherein he was rear-ended. According to him, he experienced sore muscles in his neck and in between his shoulders after the crash, but that it was not the same type of pain he experienced from the accident at issue, and that the muscle soreness resolved after three or four days. He indicated that he called Dr. Blumenthal's office and was advised to just watch his pain levels, but otherwise he should be fine if he felt as if he was getting better. He further explained:

> [W]henever the [second] accident happened my anxiety level went through the roof. . . . The first worry was that, what if something else happened to my neck. . . . It took me probably thirty minutes to stop shaking because of thought of reliving what I had just went through the past three plus years.

Mr. Richman also explained at trial that he worries about, and has anxiety over, the possibility of reinjuring his neck.

Mr. Richman's wife Kimberlee also testified at trial. The two met in the summer of 2016, after the accident at issue, and they were married in July 2017. With respect to Mr. Richman's pain and symptoms that she witnessed, she explained that he would sometimes "stop in his tracks[]" from pain if he turned a certain way and that he would complain of numbness in his arm and fingers. She noted that he was not typically a complainer, but she could tell from his body language and personality that he was in pain. She also testified that he was often up at night, having to adjust his pillows multiple times, and that sometimes he would sleep on the recliner.

Mrs. Richman also explained that before Mr. Richman underwent surgery, he was very cautious when playing with her sons, and he would hesitate or have to stop because his neck would hurt. She further stated that her youngest son gets upset when Mr. Richman has to stop playing with him and that Mr. Richman is sad that he cannot continue.

Mrs. Richman also testified that following the surgery, Mr. Richman has good days where he is fully engaged and able to interact with her and her sons and is in a good mood; however, on days that he "over does it," it is "extremely painful" for him.

Based upon our review of the evidence and testimony in the record, we find that the trial court's award of $400,000 for past non-economic damages was within its discretion. The evidence and testimony showed that Mr. Richman suffered from a cervical spine injury that caused him pain and necessitated him to undergo treatment and surgery, including thirty physical therapy appointments, two cervical

epidural steroid injections, a medial branch block, an RFA, two MRIs, and a two-level cervical disc replacement surgery. In addition, the evidence and testimony support a finding that Mr. Richman suffered from pain caused by the accident during the three years following the accident through the date of trial, and that pain significantly affected the active lifestyle he led prior to the accident. Therefore, the trial court's award of damages is affirmed.

Costs

In their second assignment of error, Defendants argue the trial court abused its discretion in awarding Mr. Richman the full amount of his costs and fees he sought to tax as court costs, which totaled $55,155.47. Defendants argue that Mr. Richman's costs should be limited due to his "outrageous expectations regarding general damages [which] caused prolonged litigation," made settlement impossible, and unnecessarily increased his costs.

Defendants specifically take issue with the following: Lewy Physical Therapy/Dr. Lewy's $5,000 fee for trial testimony and travel; Dr. Wesley Austin's $2,700 fee for trial testimony and travel; Dr. William Armington's total fees of $5,805.94 for trial preparation, trial testimony, and travel expense reimbursement; Lake Area Legal's fees of $5,643.75 for planning and preparation of exhibit boards for trial; and Mr. Richman's total court costs of $18,739.39.

Louisiana Code of Civil Procedure Article 1920 states:

> Unless the judgment provides otherwise, costs shall be paid by the party cast, and may be taxed by a rule to show cause.

> Except as otherwise provided by law, the court may render judgment for costs, or any part thereof, against any party, as it may consider equitable.

19

In addition, La.R.S. 13:4533 states: "The costs of the clerk, sheriff, witness' fees, costs of taking depositions and copies of acts used on the trial, and all other costs allowed by the court, shall be taxed as costs." With respect to expert witnesses, La.R.S. 13:3666(A) states that:

> Witnesses called to testify in court only to an opinion founded on special study or experience in any branch of science, or to make scientific or professional examinations, and to state the results thereof, shall receive additional compensation, to be fixed by the court, with reference to the value of time employed and the degree of learning or skill required.

"The trial judge has great discretion in awarding costs (including expert witness fees, deposition costs, exhibit costs and related expenses)." *Boutte v. Nissan Motor Corp.*, 94-1470, p. 12 (La.App. 3 Cir. 9/13/95), 663 So.2d 154, 162.

With respect to Dr. Lewy's fee for trial testimony and related travel, Defendants argue that his personal appearance at trial was unnecessary and that submitting a video deposition would have served the same purpose at a reduced cost. However, we note that Dr. Lewy addressed Defendants' arguments, and we find no abuse of discretion in the trial court's award of his fees.

Similarly, Dr. Austin testified as to Mr. Richman's life expectancy, which was relevant to the issue of non-economic damages, and we find no abuse of discretion in the trial court's award of his fees.

As to Dr. Armington's fees, Defendants suggest they are duplicative and include the costs associated with a video deposition that was ultimately cancelled. In response, Mr. Richman points out that the fees submitted and taxed as costs did not include fees related to the cancelled video deposition, but rather reflect only his charges for preparation and attendance at trial. We find no support for Defendants'

20

argument that Dr. Armington's fees were duplicative, and we find no abuse of discretion on the part of the trial court in awarding his fees.

Further, we find no abuse of discretion in the trial court's award of Lake Area Legal's fees for planning and preparation of exhibit boards utilized at trial, as such fees are contemplated by La.R.S. 13:4533.

With respect to Mr. Richman's court costs in the amount $18,739.39, Defendants argue that the court costs awarded should be limited to ten percent because Mr. Richman only obtained ten percent of the total general damages he sought at trial and he unnecessarily prolonged litigation. In response, Mr. Richman argues that he was entitled to go forward with trial after settlement negotiations failed and that trial was necessary to resolve the dispute pertaining to causation and damages. Mr. Richman further argues that it was actually Defendants who prolonged litigation by refusing to stipulate to liability and insurance coverage and by seeking to continue the trial date. After review of the record, we find no abuse of discretion in the trial court's award of the full amount of court costs in this matter.

## DECREE

For the reasons set forth above, we hereby affirm the trial court's judgments granting Mr. Richman's motion for JNOV, increasing the amount of general damages awarded, and taxing $55,155.47 as costs. Costs of this appeal are assessed to Defendants/Appellants, Shannon Rhodus, Climax Portable Machine Tools, Inc., and The Travelers Indemnity Company.

**AFFIRMED.**

21